

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-1995

# Karnes v Skrutski & Kowalski

Precedential or Non-Precedential:

Docket 94-1633

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"Karnes v Skrutski & Kowalski" (1995). *1995 Decisions.* Paper 205.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/205

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-1633
_____


GEORGE KARNES,
            Appellant

v.

THOMAS SKRUTSKI, in his individual capacity;
EDWARD KOWALSKI, in his individual capacity

_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 91-cv-04269)
_____


Argued March 7, 1995

Before:  BECKER, SCIRICA, and WOOD*, <u>Circuit</u> <u>Judges</u>

(Filed  August 3, 1995)

                        GARY S. GILDIN, ESQUIRE (ARGUED)
                        150 South College Street
                        Carlisle, Pennsylvania 17013

                        STEFAN PRESSER, ESQUIRE
                        American Civil Liberties Union
                        125 South Ninth Street, Suite 701
                        Philadelphia, Pennsylvania 19107

                           Attorneys for Appellant

                        JOSEPH S. RENGERT, ESQUIRE (ARGUED)
                        JOANNA N. REYNOLDS, ESQUIRE
                        Pennsylvania State Police
                        1800 Elmerton Avenue
                        Harrisburg, Pennsylvania 17110

                           Attorneys for Appellees

---

OPINION OF THE COURT

---

SCIRICA, <u>Circuit</u> <u>Judge</u>.

This dispute arises out of an automobile search after the driver was stopped for speeding. This appeal, framed in the context of qualified immunity, addresses what characteristics can constitute reasonable suspicion sufficient to justify an investigatory stop and a detention based on that stop. Plaintiff George Karnes filed suit under 42 U.S.C. § 1983 (1988), alleging Pennsylvania State Troopers Thomas Skrutski and Edward Kowalski violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.[0] Karnes appeals the district court's grant of qualified immunity in favor of defendants and its denial of his motion for judgment as a matter of law.

Karnes alleged three violations of the Fourth Amendment: (1) an investigatory stop made without reasonable suspicion; (2) an unconstitutionally lengthy detention; and (3) a search conducted without probable cause. At trial, after the close of the evidence, the district court denied plaintiff's motion for judgment as a matter of law. In ruling on defendants' motion for judgment as a matter of law, the district court granted qualified immunity to Skrutski and Kowalski as to the existence of reasonable suspicion and the length of detention,

---

[0]The Fourth Amendment, as incorporated into the Fourteenth Amendment, applies to the conduct of state officials. <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961).

3

but denied it on whether probable cause existed for the police to search Karnes's car. The jury addressed this question through a special interrogatory, which it answered in defendants' favor, and the district court then granted qualified immunity to the police regarding probable cause for the search. Karnes appeals. We will reverse in part and affirm in part.

I.

A.

On October 26, 1990, George Karnes was driving his car west on Interstate 78 toward Duncannon, Pennsylvania. At about 5:00 p.m., defendant Skrutski, a Pennsylvania State Police Trooper, stopped Karnes for violating the speed limit. It is undisputed Karnes was speeding and that Skrutski stopped Karnes only because he was speeding. At the time of the stop Skrutski had no reason to suspect Karnes of any illegal activity.

After stopping Karnes, Skrutski requested that a Canine Drug Enforcement Unit be sent to assist him. Karnes contends Skrutski requested the canine unit at 5:00 p.m., immediately after stopping him, while Skrutski claims he requested the unit at 5:15 p.m. after observing many factors which made him suspect Karnes was transporting drugs. While waiting for the dog to arrive, Skrutski asked to search Karnes's camera bag, film canister, and a manila envelope. Karnes consented to these searches which revealed no contraband. Karnes refused to consent to further searches of his luggage and car.

Defendant Edward Kowalski arrived with a dog trained in narcotics detection at approximately 5:30 p.m. Between then and

4

7:00 p.m., the officers repeatedly requested Karnes's consent to search the car, but Karnes refused. Ultimately, the police used the dog to sniff the exterior of Karnes's car, and it jumped through the open driver's side window twice. The two troopers then searched the interior and trunk of Karnes's car. Their search uncovered nothing illegal, and they released Karnes at approximately 7:30 p.m., after issuing a citation for speeding.

Karnes contends that defendants lacked reasonable suspicion required by the Fourth Amendment to convert the routine traffic stop into a detention for investigation of drugs, and that even if reasonable suspicion were present, his detention for nearly two and one-half hours exceeded the scope of a seizure based on less than probable cause. Karnes also claims the search of his car was unlawful as the police lacked probable cause.

Defendants maintain the use of the dog did not violate the Fourth Amendment because they had reasonable suspicion to detain Karnes beyond the scope of an ordinary traffic stop in order to investigate whether he was transporting drugs. The length of detention, they assert, was due to Karnes's argumentative questioning of their procedures. Further, defendants assert the dog signalled the possible presence of drugs by jumping in the open window of Karnes's car, thus providing probable cause for them to conduct a full search.

Defendants contend Skrutski observed indicators of possible drug activity that provided reasonable suspicion to call for the dog: (1) Karnes's car was a blue mid-sized Honda Accord; (2) the car had high mileage for its age (145,000 miles over a

5

three-year period); (3) the car had a two-way citizens band radio; (4) the car had a radar detector; (5) the car had an antenna on the trunk, possibly for a car phone; (6) the car had Florida license plates and registration; (7) Karnes had maps in his car, one of which was open to New York City, specifically the Bronx, allegedly a center for the illegal drug trade; (8) Karnes was travelling on an interstate highway to the Harrisburg area, also allegedly a regional center for drug trafficking; (9) Karnes gave Skrutski permission to search a camera bag and manila envelope but refused to consent to further searching; (10) Skrutski noticed brown and green "vegetable matter," which he suspected was marijuana, ranging in size from dust to an inch in diameter on the rear floor of plaintiff's vehicle (in fact the "vegetable matter" was ordinary tree leaves); (11) Skrutski observed that Karnes was nervous and evaded questions; and (12) Skrutski thought that Karnes's limited baggage was inconsistent with his assertion he had been travelling a long time and that his casual attire belied his assertion he was returning from a business engagement earlier that day. Defendants further state that after Kowalski arrived with the dog they observed other factors: (1) Karnes requested to drive off of the highway to a rest stop to use the rest room; (2) they saw fast-food wrappers in the car; (3) Karnes demonstrated knowledge of drug interdiction programs.

Karnes denies the presence of many of these factors, and argues defendants asked for and received explanations for the remainder. Karnes denies the car had a car phone antenna, that

6

the maps he had were open to the Bronx, and that he was nervous. Karnes explained to the police that he bought the car used with high mileage on it and that he drove a great deal for his work installing computer systems. He explained his company was headquartered in Florida and gave the troopers a business card for them to verify the information. Karnes told them the "vegetable matter" was leaves from a recent camping trip and that his casual attire was what he normally wore on his job. Karnes admits he asked to go to the nearest exit to use a rest room to urinate but also states that he ultimately requested simply to be allowed to use the nearby woods. He contends the troopers refused his request unless he would consent to a search of his car.

B.

Karnes states that the defendants were purportedly using indicators established by the Pennsylvania State Police Department's Operation Whiteline, a program designed to train officers in evaluating conduct which otherwise might be considered innocent, but which in fact is an effort to disguise drug trafficking. Karnes contends that many of the factors Skrutski purported to rely upon were personally developed indicators which are not found in official Operation Whiteline lists, and that many of the factors the defendants developed contradict the Whiteline factors. In any case, Karnes argues the innocence of each factor.

We have previously noted that the use of indicators or drug courier profiles has been sharply challenged, especially

7

when the profiles "include constitutionally-relevant factors, such as membership in certain racial groups, or neutral factors arguably unrelated to drug trafficking, such as wearing disheveled clothing or looking 'different.'"  United States v. Coggins, 986 F.2d 651, 655 n.1 (3d Cir. 1993).  Neither in Coggins nor elsewhere have we specifically analyzed the impact drug courier profiles or indicators may have on courts' Fourth Amendment analysis.

Whether courts should give weight to the fact that a person searched met the characteristics of a drug courier profile is not a question we need to decide in this case.[0]  Defendants

[0]The Supreme Court recently responded to a defendant's claim that use of a profile served to undermine the government's reliance on the facts it presented to prove reasonable suspicion by noting that "the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent."  United States v. Sokolow, 490 U.S. 1, 10 (1989) (emphasis added).  The Court gave no indication that the profile would enhance the significance of these facts, and thus Sokolow suggests that "the drug courier profile has little meaning independent of the objective facts" presented by the law enforcement officer as sufficient to demonstrate reasonable suspicion.  United States v. O'Neal, 17 F.3d 239, 242 n.5 (8th Cir.), cert. denied, 115 S. Ct. 418 (1994).  In other words, while the factors the law enforcement officer uses to demonstrate that the profile is met can support a finding of reasonable suspicion, the profile as such does not provide any additional support for such a finding.

The drug courier profile here, which defendants have not demonstrated to be empirically valid, thus serves as no more than an investigative tool for law enforcement officers.  See United States v. Berry, 670 F.2d 583, 600 & n.21 (5th Cir. Unit B 1982) (en banc) (rejecting use of profiles without examination of the totality of circumstances, but recognizing the utility of the profile as a guide to help law enforcement officers determine which individuals merit closer attention).  The profile cannot, without more, serve as a method by which innocent factors can be lifted by their own bootstraps somehow to become suspicious.  Cf. United States v. Lopez, 328 F. Supp. 1077, 1086, 1101 (E.D.N.Y.

8

relied on numerous factors which are not part of the Operation

Whiteline profile, and they do not allege the stop of Karnes was

justified by the profile alone.  Indeed, the defendants stated:

> Indicators on which an officer may rely may
> be contained in the Operation Whiteline
> booklet, and may be developed by the troopers
> themselves based upon local information and
> things observed in their experience.  It is
> not possible to list all of the indicators in
> a single source document because they are
> dynamic and continuously changing as drug
> traffickers change their procedures.

Appellees' Br. at 7 (citations omitted).  The defendants'

reliance on the Operation Whiteline profile was thus so

attenuated as to make the profile in this case irrelevant to our

determination of reasonable suspicion.  Our analysis will look

instead at the objective facts which defendants claim constitute

reasonable suspicion.  See United States v. Cortez, 449 U.S. 411,

417-18 (1981) (holding that reasonable suspicion requires a

"particularized and objective basis for suspecting the particular

person stopped of criminal activity").

## II.

---

1971) (accepting the validity of an anti-hijacker profile
compiled through rigorous and careful scientific analysis, but
rejecting its use when one criterion was eliminated and two added
without proof that the alterations were similarly valid).  We
think it appropriate to expect that the government prove that "an
identifiable profile exist[s], that it consist[s] of specific
elements which accurately identif[y] criminals, and that the
[plaintiff] conformed to it," before expecting acceptance of the
profile as an element in the totality of the circumstances test.
See Morgan Cloud, Search and Seizure by the Numbers: The Drug
Courier Profile and Judicial Review of Investigative Formulas, 65
B.U. L. Rev. 843, 853-54 (1985).

Our review of the district court's grant of a motion for judgment as a matter of law is plenary, and we apply the same test for granting or denying it as did the district court. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). In a motion for judgment as a matter of law, we review the facts from the perspective most favorable to the nonmovant. Id. The determination of reasonableness under the Fourth Amendment is a question of law that we review de novo. United States v. Coggins, 986 F.2d 651, 654 (3d Cir. 1993); United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991), cert. denied, 502 U.S. 1093 (1992). The district court had jurisdiction under 28 U.S.C. § 1343 (1988). We have appellate jurisdiction under 28 U.S.C. § 1291 (1988).

III.

Karnes's prima facie case under § 1983 requires that he prove he suffered a violation of rights created by federal law, Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985), at the hands of a person acting under color of state or territorial law, Gomez v. Toledo, 446 U.S. 635, 640 (1980). The defendants raised the affirmative defense of qualified immunity, id., which absolves defendants if reasonable officers could have believed their conduct was lawful "in light of clearly established law and the information the searching officers possessed," Anderson v. Creighton, 483 U.S. 635, 641 (1987). This qualified immunity inquiry is an objective, fact-specific pursuit. Id.; see also Malley v. Briggs, 475 U.S. 335, 341 (1986). Defendants bear the burden of establishing the affirmative defense of qualified

10

immunity.  Ryan v. Burlington County, N.J., 860 F.2d 1199, 1204 n.9 (3d Cir. 1988), cert. denied, 490 U.S. 1020 (1989).

The district court granted in part defendants' motion for judgment as a matter of law at the close of the evidence, and we must therefore consider whether the evidence, presented in a light most favorable to Karnes together with all reasonable inferences on his behalf, could support a reasonable jury's verdict in his favor.  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination.  Deary v. Three Un-Named Police Officers, 746 F.2d 185, 190-92 (3d Cir. 1984); Abdul-Akbar v. Watson, 4 F.3d 195, 201 (3d Cir. 1993); White v. Walker, 950 F.2d 972, 976 (5th Cir. 1991); see also Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994) (holding that while qualified immunity should normally be decided by the court, where facts concerning the availability of the defense are disputed "jury consideration is normally required"), cert. denied, 115 S. Ct. 721 (1995).

The district court applied the qualified immunity inquiry separately to each of the three steps of the search.  The court first addressed whether the defendants had reasonable suspicion to turn the routine traffic stop into an investigative stop, then whether the length of the detention was reasonable for an investigative stop, and finally whether the results of the investigative stop provided them with probable cause to conduct a search of the car.

11

The initial stop passes constitutional muster because Karnes was speeding.  United States v. Kikumura, 918 F.2d 1084, 1092 (3d Cir. 1990).  But it is clear that Karnes has presented sufficient evidence to present a prima facie case that his Fourth Amendment rights were violated by the subsequent investigative stop, see Berkemer v. McCarty, 468 U.S. 420, 439 (1984), detention, see United States v. Place, 462 U.S. 696, 709 (1983), and search, see United States v. McGlory, 968 F.2d 309, 343 (3d Cir.), cert. denied, 113 S. Ct. 415 (1992).  Accordingly, defendants can only prevail as a matter of law if they are shielded by qualified immunity.

A.

Karnes claims the police did not have reasonable suspicion to conduct an investigative stop after pulling him over for violating the speed limit.  He correctly observes that the police needed a separate justification to detain him beyond the time necessary to issue a citation for speeding, Berkemer, 468 U.S. at 439, and he contends that such justification was lacking.

In order to analyze defendants' claim of qualified immunity on whether there was reasonable suspicion, we must determine whether the law was clearly established at the time of the alleged violation, and we must also decide whether, given the law at that time, a reasonable officer could have believed the conduct to have been reasonable.  See Dixon v. Richer, 922 F.2d

12

1456 (10th Cir. 1991).[0] The first part of this test is purely a question of law, but the latter part of the test requires

_____

[0]Karnes presents a preliminary argument that qualified immunity cannot apply in this instance because it would create a logical inconsistency. He argues:

> If the plaintiff proved defendants did not act as would a reasonable officer under the circumstances, it would be impossible for defendants to be immune on the ground that the same reasonable officer would believe the defendants' actions were constitutional. Where the law is clearly established and proof of the elements of the plaintiff's prima facie case would defeat the immunity, no qualified immunity defense is available.

Appellant's Br. at 36. This argument has superficial appeal but in fact misconstrues the nature of qualified immunity, and in any case has been rejected by the Supreme Court.

In <u>Anderson v. Creighton</u>, 483 U.S. 635, 643 (1987), the plaintiffs argued that "it is inappropriate to give officials alleged to have violated the Fourth Amendment--and thus necessarily to have <u>unreasonably</u> searched or seized--the protection of a qualified immunity intended only to protect reasonable official action. It is not possible, that is, to say that one 'reasonably' acted unreasonably." The Court rejected this argument. The Court's response was that qualified immunity seeks to measure whether the officer was reasonable in his understanding (albeit mistaken) of what was lawful under the Fourth Amendment. <u>Id.</u> at 643-44. There is no conflict in saying a police officer who acted unreasonably nevertheless reasonably (but mistakenly) believed his conduct was reasonable.

Karnes cites <u>Lippay v. Christos</u>, 996 F.2d 1490 (3d Cir. 1993), and <u>Deary v. Three Un-Named Police Officers</u>, 746 F.2d 185 (3d Cir. 1984), to support this argument. <u>Deary</u>, however, was decided before <u>Anderson</u>, and therefore is supplanted by the Supreme Court's subsequent determination of the question. <u>Lippay</u> is not apposite because it was a case where to prevail plaintiff had to demonstrate the officer submitted an affidavit containing statements he knew to be false or about which he was reckless as to their falsity. <u>Lippay</u>, 996 F.2d at 1504. <u>Lippay</u> provides an example of cases where proof of the Fourth Amendment violation necessarily proves a lack of reasonableness as to the existence of that violation, a situation very different from the one facing Karnes here.

application of the law to the particular conduct at issue, an inquiry which may require factual determinations if the nature of the conduct is disputed. Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992).

1.

Defendants are entitled to qualified immunity as a matter of law if the applicable law was not clearly established at the time of the alleged constitutional violation. Anderson, 483 U.S. at 640. The level of abstraction at which the plaintiff's rights are articulated is of considerable importance. Id. at 639. The Supreme Court has stated,

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id. at 640 (citation omitted). Obviously, the law was established in 1990 that searches or seizures in violation of the Fourth Amendment would violate Karnes's rights, but there was no case directly on point with circumstances identical to those facing Skrutski and Kowalski. The right Karnes seeks to vindicate is the right to be free from investigative stops unless reasonable suspicion is present.

All parties agree, and we concur, that until defendants actually searched Karnes's car the stop was in the nature of a "Terry" stop for purposes of the Fourth Amendment. In Terry v.

14

<u>Ohio</u>, 392 U.S. 1, 21 (1968), the Supreme Court held that certain investigative stops by police officers were permissible without probable cause, as long as "in justifying the particular intrusion [into Fourth Amendment rights] the police officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  See also <u>Berkemer</u>, 468 U.S. at 439 ("[T]he usual traffic stop is more analogous to a so-called '<u>Terry</u> stop' than to a formal arrest."  (Citation omitted)).[0]

The Supreme Court had refined the <u>Terry</u> standard prior to 1990, holding the types of articulable facts that can provide reasonable suspicion cannot include "circumstances [which] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures" were the circumstances accepted as reasons for the investigation.  <u>Reid v. Georgia</u>, 448 U.S. 438, 441 (1980) (per curiam).  By contrast, in <u>United States v. Sokolow</u>, 490 U.S. 1, 9 (1989), the Court, after considering the factors presented, stated that "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel.  But we think taken together they amount to reasonable suspicion."

---

[0]We note that in <u>Dunaway v. New York</u>, 442 U.S. 200, 212 (1979), the Court observed that a <u>Terry</u> stop must be limited in duration, and that a more lengthy detention "must be based on consent or probable cause."  (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 881-82 (1975)).  The stop here was not really the typical traffic stop, which is usually very brief.  We treat the length of detention issue below in part III.B.

15

Reid and Sokolow are in apparent tension with each other with respect to the ability to use circumstances or factors that appear innocent to find reasonable suspicion. The tension disappears, however, when the facts of the two cases are compared.[0] In Reid, the defendant was observed moving through an airport concourse within several yards of another man who was carrying a shoulder bag identical to defendant's. 448 U.S. at 439. The defendant occasionally looked backward in the direction of the second man. Id. A DEA agent approached the defendant, who was at that point standing outside with the other man. The agent requested their airline ticket stubs and identification, which they supplied. The tickets indicated they had stayed in Fort Lauderdale for just one day. The two men consented to a search, which uncovered cocaine. Id. The observed actions of the two men, the Court concluded, were not enough to present reasonable suspicion that they were engaged in criminal activity. Id. at 441.

In Sokolow, the defendant was stopped at Honolulu Airport by DEA agents, who found a large amount of cocaine in his carry-on luggage. 490 U.S. at 3. In contrast to Reid, the DEA agents had the following information before approaching the defendant:

> (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name

---

[0]The inquiry into the existence of reasonable suspicion is fact-specific. See Terry v. Ohio, 392 U.S. 1, 15 (1968) (observing the protean quality of police encounters with individuals).

16

under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

490 U.S. at 3. In Sokolow, the Court observed the necessity of considering "the totality of the circumstances" in order to evaluate the existence of reasonable suspicion. Id. at 8. The Court apparently attached particular significance to defendant's payment in cash, to the length of his trip, and to the agents' reasonable belief that he was traveling under an alias. Id. at 8-9. The Court focused on factors which it perceived as "out of the ordinary." Id. at 8. Reid and Sokolow, taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage--the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. This is a totality of the circumstances test. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).

Reid and Sokolow were decided before the events in this case. Together, they provide sufficient guidance to reasonable officers to make clear that detaining Karnes would only be permissible under the Fourth Amendment if they had reasonable suspicion and to show the requirements of the reasonable

17

suspicion standard.  We hold the law was clearly established for purposes of qualified immunity.

2.

Since the law was clear at the time of the alleged violation, defendants can be granted qualified immunity only if their conduct in detaining Karnes, even if in violation of the Fourth Amendment, was a violation a reasonable officer could have committed.  We must determine the propriety of the district court's grant of judgment as a matter of law "in part by analyzing the evidence adduced by plaintiff as to the conduct of the defendants."  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991).  We are seeking to determine whether a sufficient dispute about a material fact exists "to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. (quoting Anderson, 477 U.S. at 251-52).

The standard for granting or denying a motion for judgment as a matter of law does not change in the qualified immunity context.  Cf. Pritchett, 973 F.3d at 313 (observing the summary judgment inquiry does not change in the qualified immunity context).  Karnes will prevail on this issue if "a reasonable jury could find that the unlawfulness of their actions was so 'apparent' that no reasonable [police officers] could have believed [their] actions were lawful."  Lee v. Mihalich, 847 F.2d 66, 69 (3d Cir. 1988).[0]

_____

[0]The issue in Lee arose in the context of a motion for summary judgment rather than a motion for judgment as a matter of law. We

18

The district court held there were sufficient undisputed facts known by the defendants to provide them with reasonable suspicion to detain Karnes: (1) Karnes drove a blue, mid-sized Honda; (2) the car had high mileage for its age; (3) the car had a citizens band radio and radar detector; (4) the car was licensed and registered in Florida; (5) Karnes had a Florida license with a Florida address; (6) Karnes was driving on an interstate highway; (7) the car contained numerous maps, including one open to the Bronx; (8) Karnes consented to the search of certain items but then refused further consent; (9) Karnes requested to go to the rest room; (10) Karnes showed knowledge of drug interdiction programs; (11) the car contained fast-food wrappers; (12) the car contained brown and green "vegetable matter" of various sizes. Tr. of Civil Jury Trial at 5-156 to 5-157 (May 17, 1994). The district court further observed:

> The Plaintiff's mood changed. The Plaintiff was extremely nervous. That Plaintiff's car had a car phone antenna. Defendant Skrutski testified that Plaintiff's luggage and attire were inconsistent with Plaintiff's statements [concerning] the length and purpose of his trip. Defendant Skrutski also testified to difficulty in obtaining the results of the license and registration check. Plaintiff himself stated that his license tags had been previously transferred to his car and that on a previous occasion an officer had difficulty obtaining details.

have made clear, however, that "the standard for granting summary judgment mirrors the standard for a directed verdict." Rotondo v. Keene Corp., 956 F.2d 436, 442 (3d Cir. 1992) (quotations omitted).

19

<u>Id.</u> at 5-158.

Karnes contends the district court erred in finding reasonable suspicion present and in holding that all of these factors were indisputably present. We agree. We cannot agree with the district court's finding that all the factors it listed were undisputed. Viewing the facts in the light most favorable to plaintiff, a reasonable jury could believe that only certain factors were present, and that Karnes's mood did not change, he was not nervous, he had proper luggage and attire, there was no car phone antenna, and the maps were not open to the Bronx. We find the factors here insufficient as a matter of law to provide reasonable suspicion for defendants to have detained Karnes beyond the point needed to issue the speeding citation, and that there was no objectively reasonable basis for defendants to have believed they did have reasonable suspicion.

Aside from the "vegetable matter," the factors listed by the court did not provide any basis for the police to distinguish Karnes from the vast majority of innocent drivers on our interstate highways. We are cognizant that under the totality test it is possible that "objective facts, meaningless to the untrained," can provide the basis for reasonable suspicion. <u>United States v. Cortez</u>, 449 U.S. 411, 419 (1981). But the Fourth Amendment does not allow random searches of persons travelling the nation's highways. The factors the district court listed, like those to which the police testified, are simply too ordinary--too much like the factors in <u>Reid</u> and not enough like those in <u>Sokolow</u>. As we noted above, reasonable

20

suspicion cannot include "circumstances [which] describe a very large category of presumably innocent travelers, who would [then] be subject to virtually random seizures." Reid, 448 U.S. at 441.

The test for reasonable suspicion is a totality of the circumstances inquiry. Although we do not analyze each factor in isolation, we will describe these factors separately in order to explain why they were insufficient in the aggregate.

Karnes was the Northeast Field Engineer for Financial Securities Information Systems, and his principal responsibility was the installation of computer systems throughout the Eastern seaboard. Karnes bought his car used with 80,000 miles on it, a fact he had explained to defendants. In any case, high mileage on a car is not by itself suspicious, nor is the presence of maps in a car. Clearly many people innocent of any wrongdoing will have cars with high mileage on them, and maps (whether or not open to the Bronx) are also used by huge numbers of innocent people.

Defendants argue "that mid to full size cars and cars which are average looking or common and which easily blend in with traffic are frequently used to transport drugs." Appellee's Br. at 4. This argument seeks to turn the central notion of reasonable suspicion on its head. Reasonable suspicion cannot be based on a factor that makes the person searched look more like an ordinary, innocent person; there must be reliance on factors that provide reason to suspect criminal behavior. Were we to accept this argument, we would be granting permission to conduct

21

investigatory stops of people deemed "suspiciously normal."  The
Fourth Amendment forbids granting such permission.

Karnes's car contained a citizens band radio and a
radar detector.  The presence of these communications devices
alone does not support reasonable suspicion.  See United States
v. Hernandez-Alvarado, 891 F.2d 1414, 1419 (9th Cir. 1989).  Drug
couriers may use these items, but they are devices used primarily
by people innocent of any illegal activity and alone create no
suspicion of criminal activity.

The district court found it significant that the car's
license and registration were from Florida because Florida is a
"known drug center."  Other courts have held that out-of-state
plates are consistent with innocent behavior and not probative of
reasonable suspicion.  See, e.g., United States v. Ramos, 42 F.3d
1160, 1163 (8th Cir. 1994), cert. denied, 115 S. Ct. 2015 (1995);
Tapia, 912 F.2d at 1371.  Florida is not the only "known drug
center," and the mere fact that Karnes was from Florida cannot be
a factor supporting reasonable suspicion.[0]  Presumably the vast
bulk of people with cars registered in Florida are not drug
smugglers, and they have a right to travel to Pennsylvania.[0]

_____

[0]The Court of Appeals for the Sixth Circuit observed that drug
enforcement agents might label almost any city in the country as
a major narcotics distribution center.  United States v. Andrews,
600 F.2d 563, 566-67 (6th Cir.), cert. denied, 444 U.S. 878
(1979).
[0]We do not suggest that geography is an irrelevant factor for
this totality of the circumstances test.  Certainly in United
States v. Sokolow, 490 U.S. 1, 3 (1989), it was relevant that the
defendant was travelling to and from Miami since Miami was "a
source city for illicit drugs."  But the entire state of Florida
cannot properly be termed a source of illicit drugs, and the mere

22

The fact that Karnes granted consent to Skrutski to search some items and then refused to give consent to additional searches cannot support a finding of reasonable suspicion. Karnes's right to refuse to consent falls within the Fourth Amendment's core protection against unreasonable searches and seizures. Karnes's exercise of that right cannot be penalized by adding his refusal to consent as a factor in this inquiry, even if, as defendants testified, Karnes became argumentative and difficult.

We have no reason to doubt defendants' assertion that drug couriers on occasion will request to go to the rest room, hoping thereby to gain an advantage or to dispose of illegal drugs.[0] But both parties agree Karnes requested to go to the rest room only after the police decided to use the drug dog to inspect his car. We need not decide whether a request to go to the rest room could provide reasonable suspicion in other circumstances because it could not have here: Karnes's request came after the point when the police were required to have

---

fact that Karnes' car was registered and licensed in Florida is an extremely weak factor, at best.

[0] Kowalski explained:

> And to me the training I've had is, drug couriers, when they're stopped by the police, sometimes they have back up people following them. And what we were taught is, not to let them go off the interchange. Because what the general rule is, among the couriers, is to go off the next interchange . . . [or] rest area. That's where the -- person that is escorting you will meet you. So, it's for the safety of the police officer . . . .

App. at 536-37.

23

reasonable suspicion.  Most innocent people who have traveled for any length of time will, of course, make a similar request out of physiological necessity.  We intimate no view as to whether such a request would be suspicious in some contexts, but it is not suspicious here.

The penultimate factors relied upon by the troopers were Karnes's knowledge of drug interdiction programs and the presence of fast-food wrappers in his car.  The latter have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler.  Nor do we understand how mere knowledge of interdiction programs can be suspicious.  Indeed, Karnes's display of such knowledge seems counterintuitive--if Karnes was trying to hide the presence of drugs he would scarcely announce his knowledge of drug trafficking and interdiction procedures.  Karnes announced to the police that he had gleaned his knowledge of the procedures from having watched a television program.  In any case, too much of the knowledge he displayed is in the public domain (and is well-publicized by popular television programs) for it to provide a basis for suspicion.

The last factor is the presence of green and brown "vegetable matter" on the floor of Karnes's car.  Defendants claim these leaves appeared to be marijuana, thus creating reasonable suspicion that Karnes was transporting drugs.  Karnes claims these were leaves from a recent camping trip, and that "[t]here wasn't just a little bit of leaves, there were leaves everywhere in there."  App. at 189-90.  Karnes also testified

24

that "[a]t one point Kowalski mentioned the leaves.  And he said that he knew that they weren't marijuana, but that he was going to use them as probable cause to search my car."  Id. at 190.  We review the evidence upon which the district court relied in the light most favorable to the plaintiff.  In that posture it is clear the jury could reasonably find the police did not really believe the leaves were marijuana and that they had no reasonable basis for so believing.  Thus, the leaves do not support the existence of reasonable suspicion, at least for our review of the district court's grant of defendants' motion for judgment as a matter of law on qualified immunity.

All of these factors, both individually and collectively, were insufficient to provide reasonable suspicion that Karnes was not an innocent traveler.  It is possible for factors, although insufficient individually, to add up to reasonable suspicion--that is the nature of a totality of the circumstances test.  But we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.  We hold that defendants have not demonstrated the existence of sufficient undisputed facts for us to hold that they had reasonable suspicion to detain Karnes beyond the scope of the traffic stop or that a reasonable officer could have been reasonable but mistaken in the belief that reasonable suspicion existed.  In sum, the defendants cannot receive qualified immunity on a motion for judgment as a matter of law.  A reasonable jury could resolve the disputed issues of fact in

25

plaintiff's favor, in which case defendants would lack an objectively reasonable basis for believing reasonable suspicion was present to detain Karnes.

B.

The district court also held defendants were entitled to qualified immunity on the defendants' motion for judgment as a matter of law regarding the length of detention. The Supreme Court made clear in Terry, 392 U.S. at 19-20, that "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one--whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Having decided the officers' actions here were not justified at their inception, we can abbreviate our analysis of the scope of the detention.

The district court held a reasonable officer would have believed the detention in this case was not excessive and that defendants were therefore entitled to qualified immunity regarding the scope of the Fourth Amendment intrusion prior to the search of Karnes's car. The court stated defendants followed a reasonable procedure to dispel their suspicion by employing the drug sniffing dog and that any additional delay was attributable to Karnes because he asked the troopers questions, argued with them, challenged their procedures, and insisted on explanations as to their actions.

We find the delay of nearly two and one-half hours sufficiently extreme when viewed in the light most favorable to

26

plaintiff that no reasonable officer would have believed the detention comported with constitutional requirements, and thus we hold that defendants are not entitled to qualified immunity on this issue as a matter of law. The Supreme Court has held that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." United States v. Place, 462 U.S. 696, 709 (1983). In Place, the Court held a ninety-minute delay before federal agents used a narcotics detection dog on Place's luggage, id. at 699, was sufficient "alone [to preclude] the conclusion that the seizure was reasonable in the absence of probable cause," id. at 709.

In contrast, we held in United States v. Frost, 999 F.2d 737, 741-42 (3d Cir.), cert. denied, 114 S. Ct. 573 (1993), that an eighty-minute delay was acceptable.[0] We distinguished Place on the grounds that the agents lacked diligence in pursuing the investigation while the police in Frost were delayed by the absence of a drug sniffing dog in the vicinity of the stop. Id. When viewed in the light most favorable to Karnes, the delay here was approximately 150 minutes in length from the time Karnes was stopped until he was released, and was the result primarily of the defendants' dilatory pursuit of their investigation, not

-----

[0]In combination, United States v. Place, 462 U.S. 696, 709 (1983) and United States v. Frost, 999 F.2d 737, 741-42 (3d Cir. 1993), provide sufficient clarity in the law for us to hold that the law was clear for purposes of the first prong of the qualified immunity analysis.

27

plaintiff's questioning. This length of time is excessive under the Fourth Amendment given the circumstances of this case.

It appears from the record (viewed in the light most favorable to Karnes) that defendants used much of the period between the arrival and use of the dog to attempt to cajole Karnes into granting them consent. The fact that defendants did not accept Karnes's refusal to consent, in combination with their attempt to use his refusal as a factor in creating reasonable suspicion (see supra part I), shows a misunderstanding about the purposes of the Fourth Amendment. Karnes does not bear the burden of justifying his refusal to allow police to invade his privacy; it is rather the government official who must meet the constitutional requirements before he can encroach upon an individual's privacy. The district court's grant of qualified immunity to defendants on the length of detention issue was improper.

C.

Karnes also claims the search of the car was invalid because the police lacked probable cause. The district court sent the case to the jury on the single factual issue of whether the narcotics dog had "alerted" to the smell of narcotics in Karnes's car. Because the jury found it had, the district court granted qualified immunity to the defendants on the probable cause issue and entered a verdict in favor of the defendants. We note that "[t]he automobile exception to the warrant requirement allows warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe

that the vehicle contains evidence of a crime." <u>United States v. McGlory</u>, 968 F.2d 309, 343 (3d Cir. 1992) (quotations omitted).

Karnes contends the special interrogatory was improper because whether the drug dog "alerted" was not the only disputed question of fact on the existence of probable cause. We disagree. Notwithstanding the antecedent violations of the Fourth Amendment defendants may have committed, it is clear that the drug dog's alert would present probable cause for a search. <u>See United States v. Massac</u>, 867 F.2d 174, 176 (3d Cir. 1989) ("[P]robable cause to arrest did not exist until the trained dog reacted affirmatively to the blue luggage . . . .").

IV.

Our decision that defendants are not qualifiedly immune as a matter of law on the reasonable suspicion and length of detention issues makes it necessary to consider whether plaintiff's motion for judgment as a matter of law should be granted. On this point we must consider the evidence in the light most favorable to the defendants.[0] Karnes is entitled to judgment as a matter of law if, on the record before us, and taking the evidence in the light most favorable to the defendants, a reasonable jury could only find both that the defendants violated the Fourth Amendment and that they acted unreasonably in doing so. The district court, of course, denied plaintiff's motion for judgment as a matter of law.

A.

---

[0] The relevant facts are described above in parts I and III.A.2.

29

We must determine whether a reasonable jury could decide that a police officer could have formed an objectively reasonable belief that the "vegetable matter" was marijuana. Absent the "vegetable matter," we would conclude that Skrutski and Kowalski lacked reasonable suspicion to detain Karnes.

The defendants do not need to demonstrate that the material was marijuana in order to receive a grant of qualified immunity. Butz v. Economou, 438 U.S. 478, 507 (1978) (observing qualified immunity protects officials who make "mere mistakes in judgment, whether the mistake is one of fact or one of law"). But they need to show their mistake was reasonable. Pray v. City of Sandusky, 49 F.3d 1154, 1158 (6th Cir. 1995); see also Abdul-Akbar v. Watson, 4 F.3d 195, 205 (3d Cir. 1993) (observing the Supreme Court has stated qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law") (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).

As we have noted, in deciding whether a reasonable police officer could have believed there was marijuana in plain view in Karnes's car, we view the evidence in the light most favorable to the defendants. At trial, Skrutski testified as follows:

> Q [on examination by Karnes's attorney]:
> Let's talk a little bit about this green and
> brown vegetable matter. This was on various
> spots -- over the floor of the car, isn't
> that right?
>
> A [Skrutski]: That's correct.

30

Q: And it was quite obvious as you looked in the window you could see it, isn't that true?

A: It was -- it was there.  It was visible. I don't know how obvious it was, sir.

Q: Would you please take a look at page 21 of your deposition Mr. Skrutski -- line 6. Question, "Well, are you saying you saw a couple of leaves or did you see it all over the interior of the car?" Answer, "It was in various spots on the vehicle floor." Question, "Quite obvious?" Answer, "Yes, it was."

App. at 382-83.

Q [on examination by Skrutski and Kowalski's attorney]: And there was some discussion in your testimony [earlier] about a green/brown vegetable matter.  Could you describe that?

A [Skrutski]: It was -- a green/brown vegetable matter that was -- pulverized. There were very small pieces of it.

Q: Based upon your training and experience, did you have any belief [at the time you were searching the bags Karnes consented to having you search] as to what it may have been?

A: I suspected that it may have been marijuana.

App. at 407.

Karnes's testimony presents a different picture of the appearance of this "vegetable matter":

Q [on examination by Karnes's attorney]: Okay.  Let's talk about these leaves for a second.  Because there is some mention in the police report of a green brown vegetable matter in your car.  What was that exactly?

A [Karnes]: . . . There wasn't just a little bit of leaves, there were leaves everywhere in there.  We've driven around all weekend

31

after doing this with the windows down in a state park. And there were -- the only place in my car where there wasn't some of these leaves, was where I had been sitting in the seat. They were up in the back dash. They were all over the back seat. They were in the floor. They were in -- they were in the driver side floor. Just my seat is the only place there was no leaves.

. . . .

Q: Okay. And how large were these -- were these just all crumbled up residue of the leaves?

A: They were all sizes from that big around (witness indicates) down to little tiny, tiny pieces.

App. at 189-90.

We believe this contradictory testimony creates a genuine issue of material fact, and we cannot say that a reasonable jury could never believe Skrutski's description and credit only Karnes's. The presence of drugs in plain view in an automobile creates probable cause to search, United States v. Burnett, 791 F.2d 64, 67 (6th Cir. 1986), and can support reasonable suspicion to conduct a further investigation. While the troopers were mistaken about the presence of marijuana, on the basis of this record we cannot say their mistake was unreasonable as a matter of law.

A jury will have to weigh the defendants' contention that they believed the "vegetable matter" was marijuana against Karnes's assertion that not only could no one have thought that the leaves were marijuana but also that Kowalski expressly stated he knew the leaves were not marijuana. See supra part III.A.2. A

32

jury could find that the defendants formed a reasonable belief that the leaves were marijuana, and such a finding would lead to a determination that the defendants were entitled to qualified immunity on the reasonable suspicion issue.[0]  See Pray, 49 F.3d at 1161 (observing that "many times the jury becomes the final arbiter of [defendants'] claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury").[0]

## B.

Although it is not clear from Karnes's brief and notice of appeal whether he has appealed the district court's denial of his motion for judgment as a matter of law on the length of detention issue, we need not decide whether the issue is properly before us because we would affirm the district court on this

---

[0]Judge Becker dissents on this one issue.  Noting that it is uncontradicted that the material in the car was in fact autumn leaves, he does not believe that a jury could find that the defendants formed a reasonable belief that the leaves were marijuana.  Judge Becker would therefore grant the plaintiff's motion for judgment as a matter of law and remand only for trial on damages.

[0]We are reminded that the qualified immunity defense is designed in part to avoid chilling appropriate police behavior. As the Court of Appeals for the Fourth Circuit noted in Gooden v. Howard County, Md., 954 F.2d 960, 967 (4th Cir. 1992) (en banc):

> If every mistaken seizure were to subject police officers to personal liability under §1983, those same officers would come to realize that the safe and cautious course was always to take no action.  The purposes of immunity are not served by a police force intent on escaping liability to the cumulative detriment of those duties which communities depend upon such officers to perform.

point.  At issue is whether a reasonable jury could decide that the police diligently pursued their investigation, thereby making the length of the detention acceptable.

There is no direct testimony to rebut Karnes's contention that the search occurred at 7:00 p.m. and that he was released at 7:30 p.m.  A reasonable jury could not find that the length of detention was less than 150 minutes.  Defendants produce only weak evidence to justify either the 90-minute delay between the arrival of the canine unit and its use or the nearly two and one-half hour total delay.  Defendants contend Karnes was so argumentative they were forced into a lengthy explanation of their procedure.[0]  Even though the length of detention may have been constitutionally excessive notwithstanding defendants' explanation, a reasonable jury could find that defendants were reasonable in their belief that the delay comported with constitutional requirements.  Accordingly, this is a jury

---

[0]Trooper Kowalski explained the length of the delay:

> Mr. Karnes was so argumentative, I really didn't want to push the issue into a physical confrontation.  I felt it was best, the position that we were in along the highway . . . .  Even though there were two of us there--being that close to the highway, having to work a [sic] with the dog, having the left hand tied up with a lead, and then having to worry about my firearm, which was on my right side . . . .
>
> And I really didn't want him to have any ill feelings about the state police.  I wanted him to understand what was going on.

App. at 542.

question, and the district court's denial of plaintiff's motion for judgment as a matter of law on this point was not in error.

## V.

Karnes also contends the district court erred by admitting evidence at trial of his 1985 arrest for allegedly assaulting his sister and verbally resisting arrest without violence. The court admitted this evidence under Federal Rule of Evidence 404(b) to refute Karnes's contention that he suffered damage from defendants' actions. We review the district court's admission of evidence of prior bad acts under an abuse of discretion standard. United States v. Traitz, 871 F.2d 368, 389 (3d Cir.), cert. denied, 493 U.S. 821 (1989).

Defendants argue the evidence was properly admitted after Karnes testified that the incident in this case diminished his respect for the police and thus caused him damage. After applying the balancing test of Federal Rule of Evidence 403, the district court gave a limiting instruction, admonishing the jury to consider the evidence only for the purpose of determining damages.

We have held that evidence of prior bad acts under Rule 404(b) can be admitted when the evidence is probative of a material issue other than character. Traitz, 871 F.2d at 389. We see no abuse of discretion here.

## VI.

On the issues of reasonable suspicion and length of detention we will reverse the district court's grant of defendant's motion for judgment as a matter of law. We will

35

affirm the remainder of the district court's decisions.  We will remand the case to the district court for it to allow the jury to make a determination of the reasonable suspicion and length of detention issues and for an assessment of damages as appropriate.